613 S.W.2d 453 (1981)
In the Matter of the Marriage of B. S. H., Respondent,
v.
J. J. H., Appellant.
No. WD 31110.
Missouri Court of Appeals, Western District.
March 2, 1981.
*454 Richard C. Thomas, Columbia, for appellant.
Darwin A. Hindman, Jr., Columbia, for respondent.
Steven G. Gladstone, Columbia, guardian ad litem.
Before WASSERSTROM, C. J., SHANGLER, DIXON, PRITCHARD, CLARK and MANFORD, JJ., and SWOFFORD, Senior Judge.
CLARK, Judge.
In this dissolution of marriage case, the issues contested were the paternity of one child, the custody of another and the financial obligation for their support. The trial court found both children to have been born of the marriage, placed both in the custody of the wife and awarded her an allowance payable by the husband for the children's support. The husband appeals.
Some details of the parties' marital experience were established without dispute. The marriage ceremony was solemnized September 14, 1974. The first child was born March 9, 1975, and a second was born September 1, 1976. From time to time during the brief period of the marriage, the parties separated and the husband left the home to live elsewhere, on occasion returning to live with his parents and, once, moving to the state of Texas. On the dates when each of the children was born, these separations had occurred and the husband was absent. The ultimate breakdown of the marriage, conceded to be irretrievable, brought about a final and permanent separation February 15, 1978, and, subsequently, this action filed by the wife for dissolution.
The acquaintanceship of the parties predated the marriage by some time, but they were intimate during a shorter interval, four months according to the wife and one month by the husband's recollection. Both agree, however, that the wife told the husband before they were married that she was already pregnant. The husband claims that the child was not and could not have been his but he does acknowledge that he married with the information as to his wife's condition, that the matter was discussed between them and he agreed to raise the child. According to the wife, her conception was the result of the pre-marital *455 relation with the husband and the prospective birth of a child was the reason for entering into the marriage. The subject of the child's paternity was never mentioned within the child's hearing but the husband asserts that the wife frequently in times of dispute and discord told him the child was not his and named others who were or could have been the father.
The issues of custody, paternity and support contested at trial and here are interrelated. Although the husband professes affection for the older child, he has firmly and consistently denied that the child is his. He cannot, as a matter of consistency, claim any interest in the award of that child's custody. The husband does, however, contend that the wife is not a fit person to have custody, a fact determination which of necessity must bear on the decision for placement of both children. The custody award is therefore reviewed on the husband's first point of error with equal regard for the interests of both children.
The evidence here, in common with many cases where the custody of children is in issue, is sharply conflicting. The fitness of each parent to act as custodian is attacked or supported depending on the source of the testimony. While the court was obligated to accept some evidence on the subject and disbelieve other evidence, the fact is that neither of the contesting parties here could claim an exemplary record of conduct or character and each evidenced some immaturity. The trial court had no clear choice which would insure the future well being of the children, but was obligated to select from less than fully satisfactory alternatives.
The trial court occupies a superior position to evaluate fact questions because it has the parties before it and its decision is entitled to some deference on this account. Markham v. Markham, 429 S.W.2d 320, 323 (Mo.App.1968). In the review of a court tried dissolution case, the decree must be sustained unless it is not supported by substantial evidence or is against the weight of the evidence or is erroneous in application or declaration of the law. In re Marriage of Strelow, 581 S.W.2d 426, 429 (Mo.App. 1979). The trial court's decision in awarding child custody should not be disturbed unless the reviewing court is firmly convinced that the welfare of the children requires some other disposition. In re Marriage of Hayden, 588 S.W.2d 165, 167 (Mo. App.1979); Johnson v. Johnson, 526 S.W.2d 33, 36 (Mo.App.1975).
We are unable to conclude here that the award of custody made by the trial court is not in accord with the evidence. More significantly, there has not been shown to be available any alternative custody arrangement which this court could order with any conviction that the welfare of the children would thereby be better served. On settled principles, we accept and affirm the custody disposition which the trial court ordered.
The husband next contends that the trial court erred in charging him with the financial obligation for contribution in support of the older child because evidence from blood grouping tests conclusively verified his claim that he was not the child's father. This evidence on which the husband now places substantial reliance was neither secured by him nor introduced by him at trial. That evidence was obtained by the guardian ad litem after testimony in the case in chief had been concluded and was offered by the guardian at a second adjourned hearing. Some procedural history of the case must be recounted to explain the origin of the blood test evidence and the limitations on the effect of the evidence which the facts of the case impose.
The guardian was appointed by the court sua sponte but the order was entered only five days before trial commenced. Apparently the appointment was prompted by the husband's responsive pleading filed nine months earlier disclaiming paternity of the one child. When the case was called, the guardian was not present in the courtroom and attorneys for the wife and husband expressed some surprise because neither was aware of the appointment. A brief recess was called for the purpose of securing *456 the guardian's attendance. When the guardian did appear after the recess, he stated that he had learned of the appointment only on the previous day, he had not known the case was set for trial and he was unfamiliar with the facts.
Despite the obvious inability of the guardian to participate in any effective way, the court directed that the case proceed, apparently to accommodate out of town witnesses. The guardian was instructed to make his investigation later and inform the court if further evidence would be required. To the extent the guardian's limited information permitted, he participated in the trial by questioning the witnesses and the case was continued for an additional hearing depending on the results of the guardian's later investigation.
During a succeeding period of some two months, the guardian acquainted himself with the physical circumstances of the parties in their respective homes, interviewed friends and relatives and inquired into the condition of the children. He also proposed that the parties and the children be given blood tests to evaluate the husband's disclaimer of paternity. Finally, another hearing was conducted, principally for the purpose of allowing the guardian to interrogate the witnesses with his recently acquired knowledge of the case. It was at this hearing that the blood test evidence was offered by the guardian and received without objection.
Although the blood analysis was a procedure suggested by the guardian to resolve the paternity issue, neither the wife nor the husband made any objection and the tests were given on a voluntary and informal arrangement. The parties and the guardian were restricted by a lack of funds to pay for medical and laboratory services and to compensate any expert witness for testimony at trial. The blood test procedure was reduced to an uncertain and imprecise exercise divised to meet what was apparently perceived as the exigencies of the case.
At the subsequent hearing, the parties testified that each had gone to Woodland Hospital in Moberly at separate times to have blood drawn and each had taken one of the children for the same purpose. The witnesses had no knowledge of the test procedures, the identity of the medical or technical personnel at the hospital or the test results. The blood grouping analysis evidence consisted only of exhibits offered by the guardian on a stipulation not adequately set out in the record but apparently reflecting an agreement by counsel waiving source identification of the documents. Four exhibits bore the name of Woodland Hospital and purported to show the blood types of the husband, the wife, and each of the two children. An additional exhibit was an extract from a work titled Clinical Diagnosis By Laboratory Methods, a learned treatise which counsel agreed is recognized in the medical profession as authoritative in matters of blood grouping examinations.
Interpretation of the blood test results was not supplied by any expert witness. In the husband's view of the documentary evidence, however, the blood type grouping of the older child, when compared with the blood types which he and the wife are shown to have by the test results, demonstrates, according to the authoritative text, that he could not have fathered the child.
Limitations on the reliability of the blood test evidence are obvious, not alone because interpretation of the result was left for lay assessment. The critical test result documents bear no signature, they are not attested or certified, the name of an attending physician or laboratory technician does not appear and there is no method of determining from the record how the documents came into the possession of the guardian to be offered in evidence. No witness testified as to how the integrity of the blood samples was preserved through the testing process, what methods were employed to identify the blood characteristics and what professional qualifications were held by the unidentified persons who performed the tests and reported the results. In fact, the guardian reported that he had attempted to secure testimony from a physician interpreting the test results as to the issue of paternity, but the doctor refused because he *457 had not been present when the blood samples were taken and analyzed and he could therefore not be certain of the basic requirements for data accuracy.
A child born in wedlock is presumed to be legitimate irrespective of whether or not the conception of the child may be calculated to have occurred before the marriage. Bernheimer v. First National Bank of Kansas City, 359 Mo. 1119, 225 S.W.2d 745 (banc 1949). At common law, the presumption of legitimacy was conclusive if the husband was within the jurisdiction of the King of England and was rebuttable only on proof of the husband's impotence. F_____ v. F_____, 333 S.W.2d 320, 326 (Mo.App.1960). The presumption was a rule of substantive law. In present times, the strictures of the early rule have been significantly modified and the presumption is now a rule of evidence.
The burden is upon the party asserting illegitimacy to establish the fact by clear and convincing evidence which leaves no room for doubt. J. M. L. v. C. L., 536 S.W.2d 944 (Mo.App.1976). This onerous burden requires a quantum of evidence such that no conclusion other than that of illegitimacy can be reached. S_____ v. S_____, 520 S.W.2d 652, 654 (Mo.App.1975). When the party against whom the presumption operates presents substantial evidence to rebut the presumption, the issue is then decided on all the evidence in the case as if there had been no presumption In re L_____, 499 S.W.2d 490 (Mo.banc 1973). Even if the presumption is rebutted by substantial evidence, the issue is not thereby resolved because substantial evidence may be insufficient to carry the burden of proving illegitimacy. D. S. v. H. T. H., 600 S.W.2d 698 (Mo.App.1980).
The effect of these evidentiary requirements is: (1) absent substantial evidence to the contrary, the presumption is sufficient to defeat a claim that a child born in wedlock was not fathered by the husband, and (2) a child born in wedlock may be declared illegitimate only if the substantial evidence to the contrary when considered with all other evidence in the case is of such a persuasive quality that the fact of illegitimacy cannot be said to be in doubt.
Some few cases, notably Rasco v. Rasco, 447 S.W.2d 10 (Mo.App.1969) and S_____ v. S_____, supra, have considered the effect of scientific evidence, such as the blood grouping analysis evidence in the present case, on the issue of legitimacy. In reality, scientific evidence does not by the mere appellation of the term acquire absolute verity but, like other evidence, it depends on qualitative factors which themselves tend to lend greater or lesser credence to the proof. In short, the scientific evidence depends on the methodology employed to obtain it and the skills of those who possess or claim to possess some expertise in the subject, all of which must be shown as essential to the proof. In S_____ v. S_____, supra, that proof was adequate; in Rasco v. Rasco, supra, it was not.
The blood test evidence in this case is of dubious accuracy and origin and any conclusion which may be extracted from it as to the issue of paternity depends significantly on speculation, conjecture and non-professional extrapolation. Without the requisite substantiation in the deficient areas noted earlier in this opinion, the bare exhibits do not rise to the level of scientific proof at all. These exhibits were, of course, in evidence for such weight as the trial court chose to give them; but far from being conclusive on the subject as the husband argues, they were entitled to be disregarded as we would conclude from the record to have been the case. There was no error in so doing.
The issue of legitimacy of the older child was, apart from the blood test results, an issue of credibility between the wife and the husband. Upon a finding that the child was born of this marriage, the orders for custody and support necessarily followed. We are constrained to set aside the trial court's decision only if there was insufficient evidence to support it and with caution only upon a a firm belief that the *458 decree is wrong. In re Marriage of Pate, 591 S.W.2d 384, 388 (Mo.App.1979). No such showing has been made in this case and the conclusion of the trial court must be sustained.
No question has been raised in this case as to the amount of child support, the terms of visitation or other details included in the decree dissolving the marriage, and those orders are therefore to be affirmed without comment. Also beyond the scope of this opinion is the effect ascribed to the husband's knowledge before marriage that the wife was pregnant and his recognition of an obligation to raise the child thereafter born. While the result reached here is consistent with de facto filiation, the proposition was not asserted, briefed or argued and has therefore not been treated.
Finally, the guardian ad litem who had previously filed no brief and had not otherwise appeared on this appeal was appointed by order of this court entered September 23, 1980, to represent the minor children. He thereafter filed his brief and argued, among other points, that the judgment of the trial court erroneously charged the guardian with a violation of his duty in procuring and introducing in evidence the blood test results which tended to show the older child as illegitimate. In connection with that finding, the trial court also denied the guardian's application for compensation.
It is doubtful that the issue of critical comment in the judgment has been preserved and is before this court on the appeal. The record does demonstrate, however, that on motion of the guardian, the court subsequently amended its judgment and made a fee allowance to the guardian. From this we conclude that the trial court modified its earlier findings as to the performance of the guardian and did so by implication. The fee which was allowed was ordered taxed as costs.
The opinion by this court in In re Ray, 602 S.W.2d 955, 958 (Mo.App.1980) indicates that the court has inherent power to allow compensation to an appointed guardian but the lack of statutory direction precludes taxing the allowance as costs in the case. The amounts must therefore be recorded by judgment payable by the party against whom the judgment is entered. The record as to the sum which the trial court allowed as compensation to the guardian must therefore be modified to show the allowance as a part of the judgment award.
The guardian has also applied here for an allowance of fees and expenses for services since September 23, 1980, and he has submitted his time record and itemized statement. Unfortunately, the limited financial resources of the husband and the wife restrict in practical effect both the amount and the prospect for payment of any sums which may be adjudged.
Without intent to indicate the actual value of the guardian's service but upon consideration of all factors, an appropriate fee is found to be $350.00 and, in addition thereto, expenses of $100.91. The total fee and expenses allowed to the guardian is to be recorded as a joint judgment against both the wife and the husband.
The cause is remanded with directions that judgment be entered against the wife and the husband and in favor of the guardian ad litem in the amounts of $150.00 as the fee previously allowed by the trial court, the additional fee of $350.00 and expenses of $100.91 as allowed herein or a total judgment of $600.91 and, as so modified, the judgment of the trial court is affirmed.
WASSERSTROM, C. J., and SHANGLER and DIXON, JJ. concur.
MANFORD, J., dissents in separate opinion.
PRITCHARD, J. and SWOFFORD, Senior Judge, concur in dissent.
MANFORD, Judge, dissenting.
I must dissent.
The majority opinion disposes of this appeal by applying a legal presumption and concluding that the evidence was not sufficient to overcome the presumption. I disagree with the conclusion reached regarding *459 the evidence, and believe the time has arrived for our courts to speak directly to the role of blood group tests in questioned paternity cases and the relationship of those tests to the legal presumption of legitimacy.
While this appeal presents the question of fitness for custody and charges error in the granting of custody to respondent, this dissent addresses only the issue of paternity of the female child. Reversal is urged for what is believed to be a more accurate determination of the paternity question. Upon rehearing, the issue of fitness could then be weighed in light of the question of paternity.
There is nothing in the record to suggest that the birth of the female child was anything other than the result of a normal term pregnancy. Appellant testified that he and respondent knew each other only one month prior to their marriage. The female child was born six months after the marriage date. Appellant further testified that respondent told both him and his mother that he was not the father of the female child. In his answer, he denied the paternity of the female child.
Respondent, in her petition, alleged appellant was the father of the female child. Respondent testified she and appellant had known each other four months prior to the marriage. This cause was tried to the court on two separate occasions, the interruption being occasioned by the court-ordered blood tests. At the first hearing, respondent stated that appellant was not the father of the female child, and, in fact, identified the real father. However, at the second hearing, she testified that appellant was the father.
During the pendency of the proceedings, the trial court appointed a guardian ad litem for the minor children. The guardian, upon formal motion, secured an order of the trial court directing appellant, respondent and the two minor children to submit to blood tests for blood grouping identification. The parties consented to the testing.
After the blood tests were secured, the proceedings resumed and the guardian ad litem, with the consent of the parties, was permitted to introduce five exhibits. These exhibits consisted of the following: (a) blood test of appellant showing blood type 0 positive & RH, (b) blood test of the minor male child showing blood type O, D neg. Du neg., & RH, (c) blood test of respondent showing O neg. & RH, D neg., Du neg., (d) blood test of the minor female child showing B neg. & RH, D neg., Du neg and (e) an excerpt from a medical journal entitled CLINICAL DIAGNOSIS BY LABORATORY METHODS.[1] The pertinent portion of the medical journal declared that Factors A or B could not appear in a child unless present in one or both parents.
The foregoing exhibits were received into evidence by the trial court. The only remaining reference to the exhibits was an on-the-record statement by the guardian that he had requested a physician to appear and testify regarding the blood tests. The physician declined, not because he lacked confidence in blood group testing, but simply because he was not present when the tests were performed.
The trial court entered its judgment and in so doing, dissolved the marriage and declared appellant to be the father of both minor children. On the question of paternity of the female minor child, the court declared that "respondent (appellant at trial), despite the improper admissions of the Guardian ad litem, has failed to overcome the presumption of the legitimacy of the (female child)."
At this juncture, it is important to view the evidence, in sum total, on the issue of paternity of the female child. On the one hand, there was respondent's declaration that appellant was not the father of the female child, and the identification of the child's father, followed by a retraction of such testimony. In contrast, there was appellant's initial and consistent denial that he was the father of the female child. Additionally, five documents were admitted into evidence by agreement of the parties, which on their face conclusively prove that appellant could not have fathered the female child.
*460 No exception is taken with the position of the majority opinion in declaring that the presumption of legitimacy has transformed from a rule of substantive law to a rule of evidence. It is the refusal to proceed further to consider the total applicability of blood group tests in paternity proceedings to which exception is taken. The presumption of legitimacy of a child born in wedlock has been declared to be the strongest presumption known to the law, see Rasco v. Rasco, 447 S.W.2d 10 (Mo.App.1969). Rasco declared that the quantum of evidence necessary to overcome the presumption "must be not only clear and convincing ... but it must be such that no conclusion other than that of illegitimacy can be reached," Rasco at 17, 18. The court, in Rasco, declared that the testimony of a physician witness for the defendant based upon reasonable medical certainty failed to overcome the presumption. The court relied heavily upon the case of Bednarik v. Bednarik, 18 N.J. Misc. 633, 16 A.2d 80 (1940). Bednarik has been criticized in Schatkin, Disputed Paternity Proceedings, X-XX-X-XX (4th rev. ed. 1979). The majority opinion dispenses with Rasco by simply declaring that the evidence in Rasco was not adequate. A closer analysis of Rasco leads to a much stronger conclusion in that testimonial evidence premised upon reasonable medical certainty is not sufficient to establish nonpaternity. If the instant case were reversed to secure additional evidence (the blood tests), two results could be achieved. First, there could be a case decision establishing the conclusive nature of blood group tests in nonpaternity cases. Second, Rasco would no longer be controlling of the issue, thus providing a clearer standard to be adhered to by litigants, members of the bar and the courts. Rasco speaks to the issue of the physician's evidence based upon reasonable medical certainty. The standard for current times is better served by recognizing the developments in blood group tests and the role they should be permitted to play in current nonpaternity proceedings. By such a new approach, Rasco would then be appropriately placed in legal oblivion where it belongs.
Since Rasco, the question of blood group testing, as those tests interrelate to the presumption of legitimacy, has not been raised. It should be noted that the case cited by the majority, S_____ v. S_____, 520 S.W.2d 652 (Mo.App.1975), while addressing the question of presumption, does not include blood group testing.
In 1972, blood group testing became an issue in a criminal proceeding for failure to support. Concededly this case, by its very nature, did not include consideration of the presumption because the parties were never married. The court, however, in addressing the question of reliability of blood group testing, not only clearly recognized the effect which should be given blood group tests, but provided a basis for a more correct disposition of the instant proceedings if this court would only take the opportunity to face up to the issue in full. In this case, State v. Summers, 489 S.W.2d 225, 228, 229 (Mo.App.1972), the court declared, "the reliability of blood tests properly given to prove nonpaternity in certain cases of blood groupings has become unquestioned in the scientific and medical world ... Our search of the law has caused us to conclude that we must take judicial recognition that although serological blood tests to determine type or group cannot indicate that a particular person is the father of a child, they can be used to establish that a particular person is not the father." The court went further in pointing out that the "`[t]he Pathologist whose report excludes paternity is not giving "opinion" evidence. He is testifying to ... a fact of life and Nature.' (citing treatise)"
The rationale which provides the presumption of legitimacy originated at a time when the scientific and medical world could not provide the degree of certainty of nonpaternity by blood group testing. The presumption was premised upon (1) the protection of the assumed virtue of the mother and the protection of innocent offspring from the undesirable effects inherent in branding a child illegitimate; (2) the preservation of the integrity of the family and (3) the preference that support of a child is *461 to be provided by the husband rather than the state.
At this juncture, it is well to analyze the above three parts of the rationale in light of the evidence in the instant case. The only conceivable reason within the three foregoing reasons is the possible protection of the offspring (female child) from the inherent effects of branding the child illegitimate. Certainly, the virtue of respondent cannot even be supposed when the evidence is considered, because under oath, she denied that appellant was the father and named the real father. She then withdrew from that position and alleged that appellant was the father. Preservation of the family (no. 2 above) provides no basis for imposition of the presumption. The evidence herein discloses that respondent repeatedly reminded appellant he was not the father of the female child on those occasions where appellant attempted to discipline the child. As a further note, the decree of dissolution speaks for itself regarding the matter of family integrity.
The majority opinion satisfies the third and final portion of the rationale of the presumption because of the result reached. The actual fact is that if appellant is not the father of the child, the court has declared him so and has placed the burden (or satisfied the preference) for support of the female child on the wrong biological father. In this case, at least initially, respondent identified the actual father. If, upon rehearing, the blood group tests establish that appellant is not the father, then respondent is left to secure support for the child from the actual father and the third segment of the rationale is satisfied with only one rather important additionthe responsible father of the child is then called to support the child.
The above three segments or parts of the rationale for the presumption are not questioned for their laudable purposes. However, with the passage of time and the development of scientific testing, their immutable stance must be questioned individually and in total. There is an ever-increasing amount of literature and authority which recognizes the authenticity of blood tests as evidencing nonpaternity, see Schatkin, supra; 1 Wigmore, Evidence, Section 165a (1940); Richardson, Modern Scientific Evidence, Sections 12.16-12.19 (2d ed. 1974); McCormick, Evidence, Section 211 (2d ed. 1972); Annot., 46 A.L.R.2d 1000, 1028 (1956); Uniform Act on Paternity, Sections 7-10; Uniform Act on Blood Tests to Determine Paternity and R. Gradwohl, Legal Medicine (1954), pp. 524-592. For a critical analysis of the Rasco decision and the above rationale, see Children Born in Wedlock: Blood Tests and the Presumption of Legitimacy in Missouri, 39 U.M.K.C.L.Rev. 121 (1970) and The Presumption of Legitimacy is Rebuttable?, 35 Mo.L.Rev. 449 (1970).
There is a split of authority in determining the weight to be given blood tests as evidence. Those jurisdictions which hold such tests to be conclusive reason that to hold otherwise would be to reject established scientific fact and accuracy, see Anonymous v. Anonymous, 1 A.D.2d 312, 150 N.Y.S.2d 344 (1956); Beck v. Beck, 384 P.2d 731 (Colo.1963); Commonwealth v. Stappen, 336 Mass. 174, 143 N.E.2d 221 (1957) and Ross v. Marx, 21 N.J.Super. 95, 90 A.2d 545 (1952). Jurisdictions holding blood tests should be entitled to the same weight as other evidence emphasize the fallibility of science and scientists and the risk of error in the taking and analyzing of the tests, see State v. Camp, 286 N.C. 148, 209 S.E.2d 754 (1974) and Langel v. Langel, 175 N.E.2d 312 (Ohio App.1960).
Two recent decisions dealing with blood tests, while not exactly applicable to the instant case because nonpaternity is the issue, are of special note because they show recent further development in both science and the law. Washington v. Meacham, 93 Wash.2d 738, 612 P.2d 795 (banc 1980) declares that compulsory blood tests of a putative father are not unconstitutional concerning the violation of the right to privacy, freedom of religion and freedom from unreasonable searches and seizures. Blood group tests have expanded to the point of admissibility to prove paternity. The Human Leukocyte Antigen (HLA) blood test, *462 having been shown to be 98% accurate, has been held admissible to prove paternity, see Miller v. Smith, 6 F.L.R. 2660 (decided by the Circuit Court of Cook County, Illinois on 5-27-80), citing Cramer v. Morrison, 88 Cal.App.3d 873, 153 Cal.Rptr. 865 (1979); County of Fresno v. Superior Court, 92 Cal. App.3d 133, 154 Cal.Rptr. 660 (1979); Camden County Board of Social Services v. Kellner, 6 F.L.R. 2412, (opinion released by the New Jersey Juvenile Domestic Relations Court on 3-14-80); Malvasi v. Malvasi, 167 N.J.Super. 513, 401 A.2d 279 (N.J.1980); and Commonwealth v. Blazo,___ Mass. App.____, 406 N.E.2d 1323 (1980).
It serves no purpose to restate the factual matter of the instant case, and it suffices to state that this dissent does not agree with the conclusion of the majority opinion regarding the evidence. This dissent expresses the view that there is sufficient evidence upon the record of these proceedings to warrant a reversal of this case with directions to the trial court to conduct a rehearing to obtain further competent evidence related to the taking, evaluation and presentation (as evidence) of blood tests of the four persons involved herein.
The majority opinion is satisfied with declaring the status of legitimacy of the female child by the invocation of the legal presumption of legitimacy. While the purpose of the majority opinion is not the main concern of this dissent, by the same token, this dissent expresses a view that determination of the legitimacy of this female child upon the particular posture of the evidence is untenable. A more proper manner of disposition, and not predisposition, as is called for in the majority opinion, could be achieved upon reversal and rehearing. In addition, the legal presumption could be put to a more valid objective test.
It is neither the desire nor the wish of this dissent to presuppose the illegitimacy of this female child. Upon the evidence in this case, such conclusion could not be reached. It is submitted as well that the predetermined legitimacy of said child under the majority opinion elects to ignore what appears on the surface to be evidence that appellant cannot be the child's father.
The issue herein is far too important, not only to the parties herein, but as an issue of general importance, to dispense with it upon the basis set forth by the majority opinion.
What this dissent calls for is further consideration of the evidence in this case in order to fully answer the question of paternity demanded herein because of the particular posture of the evidence, a directive to the trial court upon rehearing to secure competent evidence on the question of the blood group tests and the recognition of blood group tests as conclusive evidence in nonpaternity cases.
The judgment should be reversed and the cause remanded for further proceedings in conformity with the reasons set forth in this dissent.
NOTES
[1] I. Davidson & J. Henry, Clinical Diagnosis by Laboratory Methods (15th ed.)